NICKERSON, Ex parte. See Case No. 7,019.

NICKERSON (COLLINS v.). See Case No. 3,016.

## Case No. 10,252.

NICKERSON v. The JOHN PERKINS. TROY v. The SPEEDWELL. MAHER v. The ACORN.

[3 Ware, 87; 19 Law Rep. 490.] [1]

District Court, D. Massachusetts. June, 1856. [2]

SALVAGE—EFFECT OF EMBEZZLEMENT BY SALVORS AND OTHER PERSONS—SLIGHT NEGLECTS — EFFECT OF POSSESSION UPON LIEN — SALVAGE SERVICE.

1. Any embezzlement of the saved property by salvors, works an absolute forfeiture of all salvage.

2. Embezzlement by other persons does not forfeit the right of innocent salvors.

3. But salvors are not only bound to strict honesty themselves, but while in proximity, are bound to take all reasonable care to prevent plunderage by others.

4. A slight neglect in this particular, will be considered in awarding the amount of salvage; and gross negligence may be followed by an entire forfeiture.

5. It is an entirely false notion of salvors, that in order to retain their lien on the property saved, they must retain the actual possession. This lien is a maritime lien that does not depend like a common-law lien, on possession.

6. A vessel was drifting in a field of broken ice, all her crew having abandoned her for the safety of their lives, and in imminent danger of coming in collision with another vessel at anchor, with one man left on board. The collision was prevented by cutting the cable, which, with the anchor, was lost. Held, whether it was the fault or misfortune of the vessel to have been left by her whole crew, she was bound to pay for the loss of the cable and anchor of the vessel which had a man on board; as every vessel must bear the consequences of her misfortunes, as well as her faults; and that this might be recovered as salvage. But the vessel having contributed nothing of active service towards the safety of the vessel, could claim nothing further.

7. Though the sacrifice was equally necessary to the safety of the salvor vessel, under these circumstances the sacrifice was not a case of average and contribution.

[These were libels by Nickerson against the John Perkins, Troy against the Speed-

---

[1] [Reported by Hon. Ashur Ware, District Judge. 19 Law Rep. 490, contains only a partial report.]

[2] [Reversed in Case No. 7,360 and Case No. 30.]

well, and Maher against the Acorn, to recover salvage compensation.]

C. G. Thomas, for libellant.

Whiting & Russel, for respondent.

WARE, District Judge [sitting for SPRAGUE, District Judge].[3] The disasters of these three vessels, which are the occasion of the present suits, happening at the same time and place, have so much in common that I have found it convenient, in order to avoid a repetition of the same circumstances, to consider them together, taking notice under the several cases, of the peculiarities belonging to each.

During the severely cold weather of the last winter, the ice formed very largely in the harbor of Boston, and along the shores of the bay, the whole way down to the extremities of Cape Cod. A large field of this ice lay off the harbor and in the Bay of Wellfleet, stretching several miles in length along the shore, and extending four or five miles into the sea. From various mischances and accidents, these three vessels, together with the Wyvern, a small fishing schooner, between the 12th and 14th or 15th, got inclosed in this large and floating field, all in the same neighborhood. When once they found themselves inclosed, it became impossible to escape. And the intense cold continuing, the frozen field continued to increase, until it extended a mile or more beyond them, into the sea. They were entirely helpless where they lay, and the extrication of them became daily more difficult. This field was not stationary, fixed, or firmly attached to the shore, but was during the whole time drifting forward and back with the wind and tide, to the distance of several miles, with the ebb and flow of each tide. Nor had it a smooth and even surface. It was in various places from time to time, broken by the swell and surging of the water under the force of the wind and tide, and one fragment thrown over and piled on another until the mass, although the ice did not form on the water more than a foot in thickness, had become, from four and five to six or seven feet thick, and all firmly cemented by the frost into a solid body. This heavy and formidable mass, as it drifted forward and back with the motion of the water, carried all the vessels inclosed within it. No anchor could have held a vessel safely to her moorings against so large and heavy a mass. If the vessel was firmly imbedded, the anchor must drag, the ice give way, or the vessel be crushed. In this situation a vessel was generally safer with her anchor up than with it down. But if the surging of the sea broke up the ice about the vessel and left her in an open lagoon, then the anchor might hold, but without contributing much to her safety. After the vessels had remained several days in this situation, driven at the pleasure of the elements with no prospect of immediate escape, and the danger increasing rather than diminishing, the crews became so uneasy and alarmed that they determined to leave for the shore, which was about four miles distant. The crew of the Wyvern, consisting of nine in all, left her Saturday, the 16th, with the exception of one man, Nickerson, who chose to remain by the vessel, rather than encounter the dangers of going on shore over the ice. Sunday, the 17th, the wind, which had been all the time fresh, increased to a gale, accompanied with a severe snow-storm, and the condition of all the vessels became one of extreme peril. About noon, the crew of the John Perkins all left her for safety, and went on board the steamer Acorn, with the intention of remaining in her the afternoon and night. She lay three-fourths of a mile or more from the Acorn. The crew of the Speedwell also came to the Acorn, she lying from her at the distance of but a few rods, and during the afternoon the men passed between the two vessels in safety, the ice being firmly frozen around them. There was a general consultation between the masters and crews of the three vessels during the afternoon, on the condition of the vessels, and to determine what, under the circumstances, it was advisable to do. And the storm not abating in its violence, it was determined to leave for the shore. About 5 o'clock, the whole of the crews of the John Perkins and Speedwell, including the masters, left, and all the crew of the Acorn, except the mate, Maher, and Troy. Captain Gibbs, of the steamer, determined at first to remain with his vessel, and he delivered his son, a boy about twelve years of age, to the care of his engineer, to take him ashore. But the boy had got but a few yards from the vessel when he became so alarmed that he refused to proceed without his father; and as it seemed that nothing could be done for the safety of the vessel if he had remained, the father can hardly be blamed for leaving her to accompany and save his child. The mate remained about an hour after the captain, and then he left; Troy and Maher followed about an hour after the mate. Such is a general outline of the facts, as they appear from all the testimony, that applies to all the cases. A large part of it was taken in the case of Nickerson's libel against the John Perkins, which was heard and argued separately. But it was agreed, in order to save the time which would be required by a diffuse reëxamination of the witnesses, that it should be imported into the other cases.

The schooner Wyvern, a fishing vessel of about eighty-one tons burthen, with a crew of nine men in all, on the 12th of February, while attempting to make Provincetown harbor, was driven by the wind into this field of ice. The crew remained in her until Sat-

---

[3] [From 19 Law Rep. 490.]

urday, the 16th, when all of them, except Nickerson, for their personal safety, left her for the shore. He being an elderly man, and in rather feeble health, chose to remain in the vessel, rather than encounter the danger of passing over four miles of rough and broken ice to the land. The wind, which during the whole time had been fresh, increased on Sunday, and before night rose to a gale, accompanied with a severe snow-storm from the northwest. At that time, the John Perkins lay in a northwesterly direction from her, at the distance of half a mile. During the latter part of the day, the violence of the wind broke the ice between the John Perkins and the Wyvern, so that there was an open sea, with only loose, floating cakes of ice. The Wyvern had her anchor down; but if that of the Perkins was also, the last drifted freely, and being abandoned by her crew, she was carried about in this open lagoon at the pleasure of the wind and tide, while the Wyvern's anchor held her fast. According to the account of Nickerson, the combined force of the wind and current drifted the Perkins directly down towards his vessel. When she was within about fifty feet, coming with her broadside directly on, so that if the Wyvern lay where she was, there must be an unavoidable collision, to avoid the disaster, he cut the Wyvern's cable, and she moved off in such a direction, that the Perkins floated past her, and the next morning lay at a considerable distance to the south; the ice, by the increasing cold and the subsiding of the wind, then became fast around both vessels, and they remained in the places where they were Monday morning till Wednesday, when the crews of the two vessels returned from the shore. Taking the account of Nickerson to be correct, there can be no doubt that a highly probable, if not a certain collision of the two vessels was prevented by the act of cutting the Wyvern's cable. Had it taken place under these circumstances, with but a single man to both vessels, it could not fail to have been disastrous if not fatal to both. It is for this service that the libellant claims salvage against the Perkins. There is, indeed, in the libel and in this testimony, considerable said about his keeping watch over her until her master and crew returned three or four days after. But nothing was done or could be done during that time, that contributed to her safety. She lay fixed fast in the ice, and only moved as that moved. But there is some doubt, to say the least, thrown over the correctness of Nickerson's account of these events, by the testimony of the other witnesses. Sunday, in the afternoon, the captains and crews of the John Perkins and the Speedwell were on board the steamer Acorn, lying at no great distance from the Wyvern and Perkins. These witnesses, especially Captain Gibbs, of the Acorn, carefully observed the movements of the vessels until 5 o'clock, when they left for the shore. Captain Gibbs confirms the account of Nickerson,

that the Perkins drifted, so that the vessels changed their relative positions. The Perkins, according to his observation, moved southwardly, and passed the Wyvern at a considerable distance from her, and so as not to come near a collision. But the Acorn lay at a considerable distance from these vessels, from a half to three-quarters of a mile, and during the whole afternoon there was a heavy and blinding snow-storm, so that it was only at intervals when there was a little relenting of the storm that the vessels could be seen at all. One of the witnesses says that he saw her two or three times only. The most careful observations under these circumstances, could not be wholly relied on. And it is further to be observed, that the movements of the vessel witnessed by Captain Gibbs and the witnesses of the Acorn, took place in the afternoon. The drifting, by which a collision was threatened, is stated, by Nickerson, to have been in the evening; and he puts it at so late an hour, 10 or 11 o'clock, that the events could not be the same as those observed by Captain Gibbs. This supposition is, however, not free from difficulty. It is certain that the drifting of the Perkins was to the south, and Captain Gibbs says that when he left at 5 o'clock, the two vessels were nearly in the relative positions they occupied on the following Wednesday; so that if the observations made from the Acorn are entirely to be relied on, there must have been some irregular movements of the vessels to have brought them together at 10 or 11 o'clock at night. But even if those observations from the Acorn made from time to time, when the vessels could be occasionally seen through a blinding snow-storm, cannot be entirely relied on for accuracy, and making reasonable allowance for this, the two accounts supposing them to relate to the same time, are irreconcilable, and we are driven to the necessity of supposing them to relate to different times; or that the witnesses on one side or the other, have wilfully prevaricated. I am unwilling to adopt the latter part of the alternative, and rather conclude that both accounts relating to different hours, may be substantially true, a supposition which is not wholly improbable.

The claim of Nickerson to salvage must rest on his own testimony. He was the only witness to the service he performed, and, as in all salvage cases, he is admitted, from necessity, as a witness to support his own libel. His testimony is open to all the observations usually made on the credit of a voluntary witness swearing for himself with no one to contradict him, and, it was contended in the argument, to some grains of additional suspicion from what was characterized as a manifest exaggeration of the perils of the vessels introduced into his libel. The libel is drawn by the proctor, and the libellants in salvage cases being often illiterate and ignorant seamen, are not, perhaps, always answerable, in the forum of conscience, however they may

be in law, for every word that is put into the libel. There are, perhaps, in this libel, some averments which we might not expect to occur to such a man as specially important, which have somewhat the look of being the promptings of counsel, conversant with the law. The libel ought to be a plain, a clear narration of the events as they actually occurred, leaving the court to apply to them the law, and without interweaving something like the heads of an argument to support the case. These circumstances have been forcibly commented on by the counsel for the claimants, and though they may deduct something from the credit one would wish to give to the testimony, they are not enough, in my opinion, to justify the imputation of a deliberate perversion of the substantial truth. And if the libellant's story is substantially true, I think he is entitled to a salvage compensation from the John Perkins for preventing a collision of that vessel with the Wyvern. But it is contended that whatever claims the libellant might otherwise have had for salvage for his services Sunday night, it was forfeited by his embezzlement afterwards of articles from the vessel. He was on board the John Perkins several times between Sunday night and Wednesday morning, when her crew returned, and as he admits, took a quadrant and compass, and some other articles, and carried them on board the Wyvern, because, as he says, he thought they would be more safe there. If they were taken animo furandi, it would be an absolute forfeiture of all claim for salvage. Courts, from considerations of public policy, are in the habit of rewarding salvage services with a liberal hand. With this liberality, salvors must be content. Punctilious honesty is required on their part, and the courts will visit every embezzlement with the forfeiture of all salvage. The quadrant and other articles taken by the libellant, were returned to the master when he returned from the shore, nor does there appear any intention, on the part of Nickerson, of appropriating them to himself. But it is satisfactorily proved that there were a number of articles abstracted from the vessel which were not returned. And, it is also in proof, that there were a number of other persons on board of her while the crew were absent. Some articles were missing, which were not taken by Nickerson, which were not returned, particularly a mattress belonging to the mate. I am unwilling to believe that he appropriated to himself any thing that he took from the vessel. But I am not so well satisfied that he took all the care that he might, and ought to have done, to prevent plunderage by others; having, as he seems to have claimed, the exclusive right of possession. Salvors are bound, not only to scrupulous honesty themselves, but while the property is in their custody, they are justly required to employ every reasonable degree of diligence to protect it from plunderage by others. Any negligence in this respect, if not

visited with an entire forfeiture of salvage, will be remembered in fixing the amount. In the present case, while I acquit Nickerson of embezzlement himself, I cannot commend his watchfulness in guarding the property against the dishonesty of others; and I regret to be obliged to take notice of it in the award I make.

With the claim of Nickerson is joined in the libel a claim of salvage by the owners of the Wyvern. I agree with the counsel for the claimants of the Perkins that, as there was nothing actually done or could be done by the Wyvern towards saving the Perkins, there can be no claim for salvage strictly, if that is considered as a compensation for active service. But I think the owners of the Wyvern are entitled to be paid for her anchor and cable. It was the cutting of her cable that prevented the collision. It is objected that the loss of the cable and anchor was a sacrifice made for the common benefit of both vessels, and that if there be any claim, it is one for contribution, and as it has been held by the supreme court (Cutler v. Reed, 7 How. [48 U. S.] 729) that the admiralty has no jurisdiction over the matter of average, that this allegation must be dismissed. This case has been likened to that of The Mazourka, decided by the circuit court of this circuit. But there is one circumstance that distinguishes it from that case. The Perkins was left without any men on board, and it was by the acts of the single man left on board the Wyvern, that the collision was avoided. In the relation of these two vessels to each other, the Perkins, being left without a keeper or guard, must be considered as in fault. This circumstance would throw on her the responsibility of a collision if it had happened, and ought, therefore, to subject her to the sacrifice by which it was avoided. It was argued that no fault can be imputed to her, because her crew had been separated from her by an overruling necessity, and there being no fault in the human agency provided for her safety, none can be imputed to the vessel. It is true that in strictness, fault, culpa, does involve the idea of a breach or neglect of duty by a voluntary agent. But in law, it may be, and is applied to inanimate objects, when there is a responsibility attached to them. It is familiarly said in cases of collision that it was occasioned by the fault of one of the vessels. The term and its legal consequences may, I think, be applied to a vessel left in a harbor or in an open roadstead, or thoroughfare, without her crew, under whatever circumstances of necessity the crew may be separated from her. If damage to another vessel is occasioned by her being thus left without a keeper, in strict propriety of language, it is rather her misfortune than her fault. But then every vessel, as well as every living agent, must bear the consequences of their own misfortunes as well as their faults, and it appears to me that the principle applies to the present case.

It may be proper before dismissing the case, to make one additional remark. The libel seems framed on the idea that salvors, by giving up the possession of the property, lose their lien upon it for salvage. This is an entirely mistaken notion. The lien of a salvor is not, like a common-law lien, at all dependent on possession. Like other maritime liens, it is founded on a jus in re, and may be enforced into whosesoever hands it comes, and if the possession is lost, the salvors may pursue their remedy against the owner by a libel in personam. The Eleanora Charlotta, 1 Hagg. Adm. 156.

### The Speedwell.

#### Salvage Decreed on the Facts.

C. G. Thomas, for libellant.
Whiting & Russel, for respondent.

The schooner Speedwell, of Plymouth, Captain Cornish, had the misfortune to get imprisoned in this field of ice, and, after being confined there several days, was, on Sunday, the 17th of February, lying about four miles from the shore of Wellfleet, and a few rods northerly from the Acorn. During the gale and snow-storm of Sunday, about mid-day, the crew of the John Perkins left her for safety, and went on board the Acorn. There they met the crew of the Speedwell; and it was determined, after a general consultation between the crews of the three vessels, to leave for the shore. Accordingly, about five o'clock, the whole of the crews of the Speedwell and the Perkins, with all that of the Acorn, except the mate, and Maher and Troy, started for that purpose. During the day, the Speedwell and the Acorn were both firmly fixed in the ice; but in the early part of the evening, it began to break around both vessels. Their condition now became more perilous, and about an hour after the crews left, that is, about 6 o'clock, the mate of the Acorn followed them. Maher and Troy now alone remained. Near the time when the mate left—perhaps a little before—the Speedwell became, by the breaking of the ice around her, so much disengaged from the firm and solid field that she began to drift, and the wind and the current carried her directly towards the Acorn, her stern being directed towards the stern of the latter vessel. The libellants, seeing that a collision was inevitable, did what they could to diminish the danger. For that purpose, they put out a fender, so that the Speedwell, instead of striking directly on the body of the Acorn, glanced off, and was carried along parallel to her side, and thus slowly passed her side by side. Some damage, but not to a considerable amount, was done to both vessels. But for the services of the libellants, that it would have been much greater, cannot, I think, admit of doubt. And in this violent tempest, enclosed in a vast field of solid ice, and in the midst of large broken masses driven by the winds in the small open space of sea in which they lay, there was certainly no small danger that these two vessels coming in collision, with no one on board of either, might both have foundered. About an hour after the mate left, and when the Speedwell had about passed by the Acorn, with a motion carrying her further in that direction off, the wind became so threatening, that the libellants left, intending to go to the Wyvern. But in the blinding snow, and the darkness of the night, they lost their way, and returned to their own vessel. But the ice had now become so broken, that they could not get aboard, and between 8 and 9 o'clock, they set off for the shore. They reached land about 12 o'clock, saw the master and the rest of the crew, and early the next morning returned to their vessel, and remained in her until Wednesday, when the crews of all the vessels came off. They found the Speedwell had passed the Acorn, and lay at a small distance south of her, and both vessels now firmly frozen into the ice. Nothing more was or could be done by them for the benefit of the Speedwell. But for the services they performed Sunday evening, they claim, and, I think, are justly entitled to a compensation. What might have been the result if no one had been on board either vessel, cannot be known; but that what was done by the libellants essentially contributed to the safety of the vessel, it seems to me cannot be reasonably questioned.

### The Acorn.

C. G. Russel, for libellant.
J. A. Abbott, for respondent.

The claim set up in the libel against the Acorn has this peculiarity, which distinguishes it from the other libels heard in connection with it. It is a claim by part of the crew for a salvage compensation for meritorious services in rescuing from danger, and saving from damage or destruction, in a time of peril, their own vessel. As a general proposition, it is undoubtedly true, that the crew cannot entitle themselves to salvage against their own vessel. They are bound by their contract to use their utmost exertions for her safety, to whatever danger she may be exposed, and their wages are the stipulated compensation, with which they agree to be content for their whole services. This is the general rule, but at the same time there are admitted exceptions. One of these is, when a seaman, from whatever misfortune happening to the vessel, has been discharged from the obligation of his contract. If he afterwards renders valuable services in saving the vessel from danger, he is treated as a stranger, and has the same rights as any other volunteer. Mason v. The Blaireau, 2 Cranch. [6 U. S.] 268, is a case of this kind. Another exception, of a more equivocal character, is this; where a seaman, in a time of great peril and difficulty, in a spirit of adventurous and daring gallantry, performs services ultra above what could be fairly required from the

strict and proper obligations of his contract, though that may be still subsisting and in force. Though this exception stands quite as much on the authority of dicta occasionally thrown out by courts arguendo, as upon any express and well considered decision which I feel at liberty to quote as an authority. The whole subject I had to consider in the case of The Dawn [Case No. 3,666], where the cases are referred to, and I have seen no cause to change the opinion there expressed. Something of this kind is intimated by Lord Stowell in the case of The Neptune, where he describes a salvor as a volunteer, who proffers useful services to the ship without being under the obligation of any contract. 1 Hagg. Adm. 236. In the possible range of circumstances he thought a case might occur, in which one of the crew, without his connection with the vessel, under his contract, being legally dissolved, might, by extraordinary services, entitle himself to a salvage remuneration. Abb. Shipp. 560, 617, notes. The only question of real difficulty, I think, is whether the facts in proof constitute this a case of that kind. For it appears to me that it cannot be fairly questioned, that a valuable service was performed by the libellants in mitigating the danger and damage, if nothing more, of the collision with the Speedwell, Sunday night, after the rest of the crew had left her.

The general circumstances under which the crews of these vessels left, for the safety of their lives, and temporarily abandoned them to the mercy of the elements, have already been mentioned. But there are some peculiarities to this vessel and crew, of which it may be proper to give a more particular detail. About 5 o'clock in the evening, when the collected crews had come to a general determination to leave for the shore, Captain Gibbs spoke to one and another of his crew, and among them to the libellants, and asked them if they were going. All except the mate and Maher and Troy, determined to go. These three determined to abide the fate of the ship, and the captain determined to remain with them. After all proper precautions were taken for the temporary safety of the ship, Captain Gibbs committed his young son to the care of the engineer, and they started for the shore; and it was not until after the captain found that his son, from fear, refused to be separated from his parent, that he determined to accompany him; a determination which, under the circumstances, will hardly be blamed by any one who is a parent. The mate and the libellants, were now all who remained in the vessel; and, about an hour after, the mate, alarmed by the increasing danger, followed the rest of the crew. Maher and Troy had both been familiarized with such dangers, by twelve years' experience in the seal fisheries, off the stormy and frozen coasts of Newfoundland and Labrador. And it was probably their experience and familiarity with such scenes, that induced them to remain by the vessel, when all the rest of the crew fled for the safety of their lives; perhaps because their experience had taught them that the peril was less formidable than it appeared; perhaps because fear, which naturally exaggerates danger, wears off by familiarity with it; and it may be from both causes. But the peril at last became too formidable for their hardihood, and, about an hour after the mate, they left to seek safety in the Wyvern. Failing to find that, in the darkness of the night, and, when they returned to their own vessel, finding that by the increasing violence of the storm, the ice was so broken around it that they could not get aboard, nothing remained for them but to perish with cold on the ice or make for the shore. They succeeded in reaching it about 12 o'clock, and found the master and crew safe in the house of Captain Baker, of Wellfleet. There they remained, and the house being over-crowded with visitors, spent a sleepless night, but had the benefit of a warm fire to dry their clothes. Early in the morning, the captain and the libellants were on the look-out, and as soon as there was sufficient light, saw the vessels not far from where they had left them. There was considerable conversation in the morning, which is reported in the testimony, with respect to the measures to be adopted, which does not appear to me to be of material importance. The most material facts are, that when the master found his vessel was afloat, he spoke to the crew and said, somebody must go to her, and that if nobody else would, he should go, though he had been badly hurt in his escape over the ice the night before, and was really unfit for the attempt. The two libellants immediately proffered their services, and, according to my recollection, they were the only members of the crew who did offer. Immediately after breakfast they set out. Indeed, I think that from the beginning, they never intended to abandon the vessel, but left from necessity, intending to return in the morning if she should then be above water; of which, when they first arrived at the house in the evening, they expressed, and of which, I believe the master and all the crew felt, no inconsiderable doubt. They accordingly did go to the vessel, and remained in her until Wednesday, when the master and crew returned. In a calamity such as overtook these vessels, even if of such a nature that the master thinks it prudent and proper for the safety of life, temporarily to leave the ship, I hold it to be quite clear and free from doubt, that the crew are not thereby discharged from their contract and released from all their obligations to the vessel; if the abandonment is only temporary. When they have escaped to the shore, they are still under the command, and bound to obey the lawful orders of the captain in all that can be done for the interest and safety of the ship, so long as there is any reasonable hope of doing anything for her safety, or that of her cargo. It is only when the master has finally aban-

doned the spes recuperandi, that the crew are wholly released from the obligations of their contract. How far the master, on such occasions, may have the rightful power to select some from his crew and send them on a forlorn hope, where he is unwilling to lead himself, need not be considered, for no such case is here presented. When it was finally determined, Sunday evening, to leave the vessel, the master did not require any of his crew to remain. He left it to their choice, even while he contemplated himself to remain. That the vessel was placed in such circumstances of danger that the crew might temporarily leave her without a desertion of duty, seems to me cannot be doubted. Such was the joint and deliberate judgment of the masters and crews of these vessels on the spot, and has, at the hearing, been fairly and fully admitted. The voluntary act of these men, in remaining by the vessel in this danger, if they had been able to render no valuable service, might have deserved some notice from the owners, though perhaps a court might not feel itself authorized to award any compensation for it in the way of extra wages. But when it is connected with a valuable service rendered to the vessel which essentially contributed to her safety, if rendered under such circumstances, that the court may reward them for it, the fact of its being voluntary, ought not to diminish their reward. When the master returned, he expressed in warm terms his satisfaction with their conduct, and told them that he should recommend to his owners to allow them a compensation.

My opinion is, that the libellants voluntarily remaining by the vessel in such dangers, when all the rest of the crew left her, and when it is admitted they might have done so without any dereliction of duty, may justly be considered as an act beyond what was required by the fair and just obligations of their contract; and for the services which they rendered Sunday night, they are entitled to a reward in the nature of salvage. But that it should be equally large and liberal as would be allowed to entire strangers for a like service, seems not so clear. Notwithstanding the calamity and danger, they were not discharged from their contract and still owed service to the vessel, though not precisely that which was rendered; and I am inclined to think that the amount should be somewhat less than would be allowed to mere strangers.

### Decrees.

The John Perkins: It appears that there were some articles, of no considerable value it is true, lost from this vessel. It is certainly not proved, and I am not ready to believe that Nickerson had anything to do with the embezzlement, and therefore it is not an absolute bar to his claim of salvage. But I think that he did not take all the care that

he might have done to prevent plunderage by others, and that this may justly be considered in the amount of salvage to be awarded. The owners of the Wyvern, a small vessel of 81 tons burthen, and in ballast, allowed him for his services to that vessel, $500. The John Perkins was heavily laden with corn, and together with her cargo, are valued at $7,100. I allow him $600, to be charged on the vessel and cargo pro rata, according to their respective values. Value of the vessel, $4,000. Value of the cargo, $3,100.

The Speedwell: I see no fault to be found with Maher and Troy. Their conduct throughout appears to have been marked by prudence, courage, and good judgment. I allow them, against the Speedwell, valued with her cargo at $4,700, the sum of $1,000, to be equally divided between them, and charged pro rata on the vessel and cargo.

The Acorn: Against the Acorn and her cargo, valued at $20,000, the vessel to which the libellants belonged, I allow $1,000, to divide equally between them. It was strongly questioned by the claimants' counsel whether, under the circumstances in which these suits were commenced, costs ought to be allowed to libellants. With regard to the costs, my opinion on the whole is that they ought to be charged on the claimants. It is true that it is the habit of the admiralty to encourage parties to an amicable compromise, and if suits are commenced in hot haste, without allowing time for that purpose, when it may safely be done, to consider it in awarding costs. These suits were commenced somewhat precipitately; but from what has incidentally appeared at the hearing, I think that there was but little probability that a fair compromise would have been affected if more time had been allowed. The cases were also somewhat novel in their circumstances, and it would perhaps not be considered as any great violation of professional delicacy and honor, if the counsel had advised his client to take the opinion of a court, rather than accept any compromise likely to be offered.

[NOTE. The decrees in these three cases were reversed by the circuit court, and the libels dismissed. the cases of the Acorn and of the Speedwell in Case No. 30, and The John Perkins in Case No. 7,360.]